[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15893

_____

D.C. Docket No. 1:10-cv-24106-MGC

JONATHAN CORBETT,

Petitioner,

versus

TRANSPORTATION SECURITY ADMINISTRATION,

Respondent.

_____

Petition for Review of an Order of the
Transportation Security Administration

_____

(September 19, 2014)

Before MARCUS, WILLIAM PRYOR and MARTIN, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

In this petition for review, Jonathan Corbett alleges that airport screening

procedures violate his right to be free from unreasonable searches. U.S. Const.

amend. IV. But before we decide the merits of that argument, we must decide

whether the 60-day deadline for filing a petition in the court of appeals, 49 U.S.C.

§ 46110(a), is jurisdictional and whether Corbett established a reasonable ground

for filing his petition more than two years after the Transportation Security

Administration deployed these screening procedures in airports nationwide. Even

though our Court previously held that the 60-day deadline is "mandatory and

jurisdictional," *see Greater Orlando Aviation Authority v. Fed. Aviation Admin.*,

939 F.2d 954, 959 (11th Cir. 1991), a decision of the Supreme Court, *Henderson v.*

*Shinseki*, ___ U.S. ___, ___, 131 S. Ct. 1197, 1206 (2011), together with an en

banc decision of our Court, *Avila-Santoyo v. U.S. Att'y Gen.*, 713 F.3d 1357, 1362

(11th Cir. 2013) (en banc), later abrogated that prior panel precedent. Those

decisions make clear that the 60-day deadline is not "jurisdictional," but is instead

a claim-processing rule. Even though Corbett's delay in filing his petition does not

defeat our jurisdiction, his petition is nevertheless untimely because no "reasonable

ground[]" excuses his delay. 49 U.S.C. § 46110(a). The Administration, the district

court, and our Court informed Corbett that Congress vested exclusive jurisdiction

to hear his petition in our Court. Alternatively, even if Corbett had timely filed his

petition, the screening procedure employed by the Administration requires only a

reasonable administrative search that does not violate the Fourth Amendment. We

dismiss Corbett's petition as untimely and, in the alternative, deny Corbett's

petition on the merits. We also grant a motion to seal filed by the Administration.

2

# I. BACKGROUND

We divide the background in two parts. First, we discuss the procedure issued by the Administration. Second, we discuss the procedural history of Corbett's petitions and the pending motions and jurisdictional question that we carried with the case.

## A. The Standard Operating Procedure

Congress created the Administration, now an agency of the Department of Homeland Security, in response to the terrorist attacks of September 11, 2001, and charged the Administrator with ensuring civil aviation security. *See* 49 U.S.C. § 114; 6 U.S.C. § 203(2). The Administrator, in conjunction with the Director of the Federal Bureau of Investigation, must "assess current and potential threats to the domestic air transportation system" and take "necessary actions to improve domestic air transportation security." 49 U.S.C. § 44904(a), (e); *see also id.* § 44901. The Administration performs "the screening of all passengers and property" before boarding an aircraft to ensure that no passenger is "carrying unlawfully a dangerous weapon, explosive, or other destructive substance." *Id.* §§ 44901(a), 44902(a)(1); *see also id.* § 44903(b) (requiring the promulgation of "regulations to protect passengers and property on an aircraft" from "criminal violence or aircraft piracy"). And Congress has directed the Secretary of the Department to "give a high priority to developing, testing, improving, and

deploying, at airport screening checkpoints, equipment that detects nonmetallic, chemical, biological, and radiological weapons, and explosives . . . ." *Id.* § 44925(a).

To fulfill these statutory mandates, the Administration issues standard operating procedures for security screening nationwide. On September 17, 2010, the Administration issued the procedure challenged in this petition, which it implemented on October 29, 2010. The procedure requires the use of advanced imaging technology scanners as the primary screening method at airport checkpoints. If a passenger declines the scanner or alarms a metal detector or scanner during the primary screening method, he receives a pat-down instead.

The scanners detect both metallic and nonmetallic objects. The Administration instituted the procedure to remedy a weakness of walk-through and hand-held metal detectors. Unlike those earlier security mechanisms, the scanners also identify nonmetallic explosives and other nonmetallic items that pose a security threat. The Administration deemed the scanners "the most effective technology available to detect threat items concealed on airline passengers." But even though the scanners and the new pat-down procedures significantly improve the detection of nonmetallic and concealed weapon devices, the Office of Intelligence of the Administration has concluded that the threat posed by improved

4

explosive devices and other weapons remains high and that terrorists continue to surveil and attempt to exploit security gaps in airport screening.

When the Administration first implemented the procedures, it employed scanners that displayed the body contour of the passenger, but they did not store, export, or print the images. The Administration deleted the images after an officer viewed them, and the Administration prohibited security officers from bringing cameras, cell phones, or other electronic recording devices into the viewing rooms.

Congress later enacted the FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, § 826, 126 Stat. 11, 133–32, which required the Administration to equip scanners with automated target recognition software. That software eliminates passenger-specific images and instead uses a generic body contour. By May 16, 2013, the scanners distributed by the Administration were equipped with the updated software and displayed only a generic body contour.

The Administration last updated the pat-down procedure in 2012. The Administration earlier modified the procedure in response to the suicide bombing aboard a Russian aircraft in August 2004 and twice revised the policy after intelligence revealed that passengers could conceal contraband in certain areas of their bodies. Later testing revealed that some security officers failed to conduct sufficient pat-downs, which prompted the most recent revisions to the procedure. When a screener conducts a pat-down, he canvasses most of the passenger's body

5

and uses the back of his hands for sensitive areas. A screener of the same gender as the passenger conducts the pat-downs, and a passenger may request that the pat-down occur in a private location. A screener may conduct an opposite-gender pat-down only in "extraordinary circumstances" as determined by a Federal Security Director.

### B. Procedural History of Corbett's Petitions

Corbett, *pro se*, challenges the use of the "nude body scanners," as he dubs them, and the pat-down procedure on the ground that they violate the Fourth Amendment. Corbett alleges that he has flown more than 100,000 miles on more than 100 domestic flights in the last 3 years and that each time he departs from a domestic airport he must undergo a security screening. He asserts that the security officers have denied him access three times because he refused to consent to the searches prescribed by the procedure. Corbett argues that substitute screening measures—canine sniff teams, metal detectors, and explosive trace detectors—are less intrusive and more effective at identifying terrorist threats.

In November 2010, Corbett filed a petition in a district court in Florida challenging the procedure implemented a month earlier. As early as December 2010, the Administration notified Corbett that Congress vested exclusive jurisdiction over his petition in the court of appeals. After a magistrate judge also concluded that the court of appeals had exclusive jurisdiction, the district court

dismissed Corbett's petition for lack of jurisdiction in April 2011. We affirmed that dismissal. *See Corbett v. United States*, 458 F. App'x 866, 870 (11th Cir. 2012). Corbett petitioned for a writ of certiorari, which the Supreme Court denied on October 1, 2012. *Corbett v. United States*, 133 S. Ct. 161 (2012). Exactly two years after he commenced those proceedings in the district court, Corbett filed this petition in our Court on November 16, 2012.

In March 2013, the Administration moved to file under seal certain portions of the administrative record and to file under seal and *ex parte* other portions of the record. The record contains five kinds of documents: public information; copyrighted and propriety material; "For Official Use Only" documents; documents designated as sensitive security information; and classified documents. In June 2013, our Court temporarily granted, in part, the motion to seal and carried the remainder of the motion with the case.

Corbett signed a nondisclosure agreement to receive access to the For Official Use Only administrative record. But in October 2013, the office of the clerk of the Court mistakenly uploaded Corbett's unredacted brief to the public docket containing some of the For Official Use Only information. Corbett alleges that a third party obtained his brief when it was available online and linked it to a website, which includes a 16-minute interview with Corbett discussing this information in his brief. After that incident, Corbett filed a motion to unseal the

7

For Official Use Only information, which we temporarily denied and instructed him not to disclose, even if the information was already available to the public through the inadvertent disclosure by the Clerk. Corbett now urges our Court to "release" him from its order barring disclosure of For Official Use Only Information documents.

## II. DISCUSSION

Before we can address the merits of this controversy, we have to decide whether we have jurisdiction over it. That is, we must first decide whether the 60-day deadline, 49 U.S.C. § 46110(a), is a jurisdictional rule or a claim-processing rule. We then consider whether Corbett has offered a reasonable ground for his two-year delay in filing his petition in our Court. We next explain that, even if it were timely, Corbett's petition fails because the challenged screening procedure satisfies the requirements of an administrative search under the Fourth Amendment. We also grant the motion to seal filed by the Administration and deny Corbett's motion to unseal.

*A. We Have Jurisdiction, But Dismiss Corbett's Petition as Untimely.*

Congress granted the courts of appeals exclusive jurisdiction to decide a petition like Corbett's, *id.*, and we have already decided in a separate action between these parties that the challenged procedure constitutes a final order. *Corbett*, 458 F. App'x at 870–71; *see also Blitz v. Napolitano*, 700 F.3d 733, 739–

8

40 (4th Cir. 2012); *Durso v. Napolitano*, 795 F. Supp. 2d 63, 67–69 (D.D.C. 2011). But before we can address Corbett's arguments about reasonable grounds for his two-year delay in filing his petition, we must decide whether the 60-day deadline is jurisdictional or whether it is a claim-processing rule.

### 1. The 60-Day Deadline Is Not Jurisdictional.

There is "a critical difference between a rule governing subject-matter jurisdiction and an inflexible claim-processing rule." *Kontrick v. Ryan*, 540 U.S. 443, 456, 124 S. Ct. 906, 916 (2004). "[A] court's subject-matter jurisdiction cannot be expanded to account for the parties' litigation conduct; a claim-processing rule, on the other hand, even if unalterable on a party's application, can nonetheless be forfeited if the party asserting the rule waits too long to raise the point." *Id.* And "a rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction." *Henderson*, 131 S. Ct. at 1202.

In *Greater Orlando Aviation Authority v. Federal Aviation Administration*, we held that the 60-day deadline for filing a petition challenging a final order is "mandatory and jurisdictional," 939 F.2d at 959 (internal quotation marks omitted), but decisions of the Supreme Court and our Court sitting en banc have abrogated that prior panel precedent, *see Henderson*, 131 S. Ct. at 1204–06; *Avila-Santoyo*, 713 F.3d at 1359–62. The Supreme Court has instructed that a deadline for judicial

9

review of an administrative decision is a nonjurisdictional claim-processing rule when Congress provides no "clear statement" that the rule is jurisdictional. *Sebelius v. Auburn Reg'l Med. Ctr.*, ___ U.S. ___, ___, 133 S. Ct. 817, 824 (2013); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515–16, 126 S. Ct. 1235, 1245 (2006) ("If [Congress] clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue." (footnote omitted)). To determine whether a provision is jurisdictional, we look to its "context, including [the Court's] interpretation of similar provisions in many years past." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 168, 130 S. Ct. 1237, 1248 (2010).

In *Henderson*, the Supreme Court identified three factors that guided its conclusion that the 120-day deadline for seeking judicial review of a decision of the Board of Veterans' Appeals was not jurisdictional: the text, the statutory context, and the degree of flexibility afforded to potential claimants. 131 S. Ct. at 1204–06. The plain language of the statute in *Henderson* did "not suggest, much less provide clear evidence, that the [120-day] provision was meant to carry jurisdictional consequences." *Id.* at 1204. Congress placed the deadline in a subchapter titled "Procedure" instead of the subchapters titled "Jurisdiction; finality of decisions" or "Organization and Jurisdiction," which "suggest[ed that] Congress regarded the 120-day limit as a claim-processing rule." *Id.* at 1205. And

10

when a veteran petitioned the Veterans Administration for benefits, those proceedings were "solicit[ous]" to veterans and far more "informal and nonadversarial" than ordinary civil litigation. *Id.* at 1205–06. For these three reasons, the Court concluded that Congress did not intend the 120-day limit "to carry the harsh consequences that accompany the jurisdiction tag." *Id.* at 1206.

Our Court, sitting en banc, applied *Henderson* in an immigration case when we overruled our precedent, *Abdi v. U.S. Att'y Gen.*, 430 F.3d 1148 (11th Cir. 2005), and held that the 90-day deadline to file a motion to reopen after a final order of removal, 8 U.S.C. § 1229a(c)(7)(C)(i), was not jurisdictional. *Avila-Santoyo*, 713 F.3d at 1362. We explained that *Henderson* had abrogated our precedent in *Abdi* when we evaluated the statute under the clear statement rule used by the Supreme Court. *Id.* at 1359–60. The text of the statute gave no indication that the 90-day deadline carried jurisdictional consequences. *Id.* at 1361. Congress placed the 90-day deadline within a section titled "Removal Proceedings," which addressed various procedural and administrative aspects of a removal proceeding. *Id.* And the exceptions to the 90-day deadline suggested "a certain degree of flexibility that is inherently inconsistent with the jurisdictional label." *Id.* at 1362 (internal quotation marks omitted).

Like the 90-day deadline in *Avila-Santoyo*, the 60-day deadline that governs Corbett's petition is not jurisdictional. *See Avia Dynamics, Inc. v. Fed. Aviation*

11

*Admin.*, 641 F.3d 515, 519 (D.C. Cir. 2011). The text does not suggest that

Congress intended the deadline to have jurisdictional consequences. *See Arbaugh*,

546 U.S. at 510, 126 S. Ct. at 1242 ("[W]e have clarified that time prescriptions,

however emphatic, are not properly typed jurisdictional." (internal quotation marks

omitted)). That is, Congress did not phrase the 60-day deadline in jurisdictional

terms when it instructed petitioners where and when to file:

> [A] person disclosing a substantial interest in an order issued by the
> Secretary . . . may apply for review of the order by filing a petition for
> review in the United States Court of Appeals for the District of
> Columbia Circuit or in the court of appeals of the United States for the
> circuit in which the person resides or has its principal place of
> business. The petition must be filed no later than 60 days after the
> order is issued. The court may allow the petition to be filed after the
> 60th day only if there are reasonable grounds for not filing by the 60th
> day.

49 U.S.C. § 46110(a). Additionally, Congress placed the deadline in the subsection

titled "Filing and venue." To be sure, the first sentence of that subsection

references the subject-matter jurisdiction of the courts of appeals over these

petitions so that petitioners would know where to file. *Id*. But in another

subsection, "Authority of court," Congress granted the courts of appeals exclusive

jurisdiction over these kinds of petitions. *Id.* § 46110(c). Any reference to that

exclusive jurisdiction in the "Filing and venue" subsection, *id.* § 46110(a), does not

convince us that the 60-day deadline is part and parcel of the jurisdictional

limitations announced in subsection 46110(c). *See also cf. Avia-Dynamics, Inc.*,

12

641 F.3d at 518 ("Although we have characterized section 46110(a) as a jurisdictional statute, we have never held that the *limitation portion* of section 46110(a)—set forth in the second and third sentences—is jurisdictional." (citations omitted)). Moreover, the exception for "reasonable grounds for not filing by the 60th day," 49 U.S.C. § 49110(a), affords petitioners a "degree of flexibility" that does not suggest the deadline is jurisdictional. *See Avila-Santoyo*, 713 F.3d at 1362.

In the same way that *Henderson* abrogated our precedent in *Abdi*, *Henderson* also abrogated our precedent in *Greater Orlando* that would otherwise govern this appeal. *See United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009) ("We may disregard the holding of a prior opinion only where that holding is overruled by the Court sitting en banc or by the Supreme Court."(internal quotation marks omitted)). The new rule announced in *Henderson* "actually abrogate[d] or directly conflict[ed] with, as opposed to merely weaken[ed], the holding of the prior panel." *Id*. We now hold that the 60-day deadline is a claim-processing rule, not a limitation on our subject-matter jurisdiction.

2. Corbett Failed To Establish a Reasonable Ground for his Delay.

Corbett's dogged prosecution of his petition in the district court is not a reasonable ground to excuse his failure to file his petition on time in this Court. *See Greater Orlando*, 939 F.2d at 959–60 (ruling that petitioner's pursuit of state court

13

remedies did not excuse failure to file before the 60-day deadline); *Americopters, LLC v. Fed. Aviation Admin.*, 441 F.3d 726, 734 (9th Cir. 2006) ("[A] delay stemming from the filing of a petition or complaint with the wrong court is not, in general, a reasonable ground for delay."); *see also Sierra Club v. Skinner*, 885 F.2d 591, 594 (9th Cir. 1989) (dismissing for lack of subject-matter jurisdiction when petitioner failed to file within 60 days and filing petition in a district court did not provide a reasonable ground for delay). Corbett's "delay is even less excusable" because "the [Administration] advised [him] of the correct remedies or procedures to follow" and his "procedural missteps were based on a misapprehension of the law." *Americopters*, 441 F.3d at 734. We have recommended that petitioners file concurrent petitions in multiple courts where jurisdiction is not clear. *Greater Orlando*, 939 F.2d at 959–60. Our dissenting colleague contends that *Greater Orlando* stands for the proposition that *distinct* claims must be filed in separate courts. (Dissent Op. at 28.) We did say as much in *Greater Orlando*, but our dissenting colleague fails to acknowledge that we also advised that "[a]dditionally, the [petitioner] could have filed both appeals concurrently, instead of pursuing state court remedies while jurisdiction was being lost" elsewhere. *Greater Orlando*, 939 F.2d at 959-60.

Corbett failed to heed that advice, despite admonitions by the Administration, a magistrate judge, the district court, and our Court that we had

14

exclusive jurisdiction over his petition. He instead pursued his Fourth Amendment challenge in the district court for nearly two years. Courts of appeals have excused a petitioner's delay when the Administration caused a petitioner's confusion, *id.* at 960, or when a petitioner unsuccessfully attempted to exhaust administrative remedies, *Reder v. Adm'r of Fed. Aviation Admin.*, 116 F.3d 1261, 1263 (8th Cir. 1997), but Corbett has not alleged anything of the kind. His conduct—the "quixotic pursuit of the wrong remedies"—cannot excuse his delay. *Americopters*, 441 F.3d at 734.

 B. *Alternatively, the Screening Procedure Is a Reasonable Administrative Search.*

Although the Supreme Court has mentioned only in dicta that airport screenings do not violate the Fourth Amendment, *see Chandler v. Miller*, 520 U.S. 305, 323, 117 S. Ct. 1295, 1305 (1997) ("[W]here the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable'—for example, searches now routine at airports . . . ."); *see also City of Indianapolis v. Edmond*, 531 U.S. 32, 47–48, 121 S. Ct. 447, 456 (2000), other courts of appeals have held that screening passengers at an airport is an "administrative search" because the primary goal is to protect the public from a terrorist attack, *see, e.g.*, *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 10–11 (D.C. Cir. 2011); *United States v. Aukai*, 497 F.3d 955, 962–63 (9th Cir. 2007) (en banc); *United States v. Hartwell*, 436 F.3d 174, 178 (3d Cir.

15

2006). We now join their ranks and conclude, in the alternative, that the challenged procedure is a reasonable administrative search under the Fourth Amendment.

The Fourth Amendment permits the warrantless search of "closely regulated" businesses; "special needs" cases such as schools, employment, and probation; and "checkpoint" searches such as airport screenings under the administrative search doctrine. *Hartwell*, 436 F.3d at 178. Because administrative searches primarily ensure public safety instead of detect criminal wrongdoing, they do not require individual suspicion. *Elec. Privacy Info. Ctr.*, 653 F.3d at 10 (citing *Edmond*, 531 U.S. at 41, 47–48, 121 S. Ct. at 450). Whether suspicionless checkpoint searches at airports are reasonable depends on "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 51, 99 S. Ct. 2637, 2640 (1979).

The scanners at airport checkpoints are a reasonable administrative search because the governmental interest in preventing terrorism outweighs the degree of intrusion on Corbett's privacy and the scanners advance that public interest. *Id*. Corbett argues that the scanners are not narrowly tailored to aviation security needs, that the scanners are ineffective for their intended purpose, and that the Administration has misled the public as to the likelihood of the threat. But "[t]he need to search airline passengers 'to ensure the public safety can be particularly

16

acute,' and, crucially, an [advanced imaging technology] scanner, unlike a magnetometer, is capable of detecting, and therefore of deterring, attempts to carry aboard airplanes explosives in liquid or powder form." *Elec. Privacy Info. Ctr.*, 653 F.3d at 10 (quoting *Edmond*, 531 U.S. at 47–48, 121 S. Ct. at 457).

"[T]here can be no doubt that preventing terrorist attacks on airplanes is of paramount importance." *Hartwell*, 436 F.3d at 179; *see United States v. Marquez*, 410 F.3d 612, 618 (9th Cir. 2005) ("It is hard to overestimate the need to search air travelers for weapons and explosives before they are allowed to board the aircraft. . . . [T]he potential damage and destruction from air terrorism is horrifically enormous."); *Singleton v. Comm'r of Internal Revenue*, 606 F.2d 50, 52 (3d Cir. 1979) ("The government unquestionably has the most compelling reasons[—]the safety of hundreds of lives and millions of dollars worth of private property[—]for subjecting airline passengers to a search for weapons or explosives that could be used to hijack an airplane."); *see also United States v. Yang*, 286 F.3d 940, 944 n.1 (7th Cir. 2002). Corbett argues that the Administration has misled the public as to the severity of the threat that terrorism poses to commercial airplanes, but that suggestion borders on the absurd and the record refutes it. For example, on December 25, 2009, a terrorist attempted to detonate a nonmetallic explosive device hidden in his underwear while aboard an American aircraft flying over the United States, for which Al Qaeda claimed credit. Passenger Screening Using

17

Advanced Imaging Technology, 78 Fed. Reg. 18,287, 18,299 (Mar. 26, 2013). Numerous other publicly known incidents of aviation terrorism have involved nonmetallic explosives. *Id.* These reported instances, not to mention those incidents unknown to the public, establish that the Administration has reasonably assessed the threat of aviation terrorism. In any event, the validity of a screening program does not "turn[] on whether significant numbers of putative air pirates are actually discovered by the searches conducted under the program." *Nat'l Treasury Emp. Union v. Von Raab*, 489 U.S. 656, 675 n.3, 109 S. Ct. 1384, 1395–96 n.3 (1989); *see Cassidy v. Chertoff*, 471 F.3d 67, 83 (2d Cir. 2006) (explaining that the government "need not adduce a specific threat" to the ferry system before engaging in suspicionless searches). Instead, "[w]hen the Government's interest lies in deterring highly hazardous conduct, a low incidence of such conduct, far from impugning the validity of the scheme for implementing this interest, is more logically viewed as a hallmark of success." *Von Raab*, 489 U.S. at 676 n.3, 109 S. Ct. at 1396 n.3.

Contrary to Corbett's assertion, the scanners effectively reduce the risk of air terrorism. *See, e.g.*, *Hartwell*, 436 F.3d at 179–80. Although this proposition is self-evident, Corbett disputes it on the ground that he has circumvented the scanners and speculates that the rates of failure and false-positives are high. But the Fourth Amendment does not require that a suspicionless search be fool-proof

18

or yield exacting results. *See Von Raab*, 489 U.S. at 676, 109 S. Ct. at 1396 (rejecting the argument that drug-testing violates the Fourth Amendment because employees may attempt to deceive the test); *Cassidy*, 471 F.3d at 86 (rejecting the argument that screening of ferry passengers violates the Fourth Amendment "because it is not sufficiently thorough"); *MacWade v. Kelly*, 460 F.3d 260, 274 (2d Cir. 2006) (ruling that the deterrent effect of an antiterrorism screening program in the New York City subway system "need not be reduced to a quotient" to satisfy the Fourth Amendment).

The Supreme Court has explained that the evaluation of effectiveness is "not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Michigan Dep't of St. Police v. Sitz*, 496 U.S. 444, 453, 110 S. Ct. 2481, 2487 (1990). Choosing which technique best serves the government interest at stake should be left to those with "a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." *Id.* at 454, 110 S. Ct. at 2487. "[W]e need only determine whether the [scanner] is a reasonably effective means of addressing the government interest in deterring and detecting a terrorist attack" at airports. *MacWade*, 460 F.3d at 273 (internal quotation marks omitted). Common sense tells us that it is.

19

Corbett argues that metal detectors, bomb-sniffing dogs, explosive trace portals, and explosive trace detectors would be better substitutes for security screening because those methods are less invasive, but we are unpersuaded that the Constitution requires these substitutes. *Cf. Aukai*, 497 F.3d at 962 ("A particular airport security screening search is constitutionally reasonable provided that it is no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives and that it is confined in good faith to that purpose." (alteration and internal quotation marks omitted)). Metal detectors cannot alert officers to nonmetallic explosives, and the United States enjoys flexibility in selecting from among reasonable alternatives for an administrative search. *See Sitz*, 496 U.S. at 453–54, 110 S. Ct. at 2487; *see City of Ontario, Cal. v. Quon*, 560 U.S. 746, 764, 130 S. Ct. 2619, 2632 (2010) ("Even assuming there were ways that [officers] could have performed the search that would have been less intrusive, it does not follow that the search as conducted was unreasonable.").

The scanners pose only a slight intrusion on an individual's privacy, especially in the light of the automated target recognition software installed in every scanner. The scanners now create only a generic outline of an individual, which greatly diminishes any invasion of privacy. Before the agency incorporated that software, the District of Columbia Circuit held that the scanners did not violate the Fourth Amendment. *See Elec. Privacy Info. Ctr.*, 653 F.3d at 10–11. And to the

20

extent that Corbett's petition challenges the use of scanners without that software, his petition is moot because those scanners no longer operate in any airport. *See Redfern v. Napolitano*, 727 F.3d 77, 84–85 (1st Cir. 2013) (vacating and remanding to the district court to dismiss as moot because the Administration removed from airport screening checkpoints all "non-ATR-equipped backscatter scanners").

Corbett also challenges the pat-down procedure, but that procedure as a secondary screening technique is a reasonable administrative search. The pat-downs also promote the governmental interest in airport security because security officers physically touch most areas of passengers' bodies. Corbett does not dispute that the pat-down procedures are effective, but argues that they are "extraordinarily intensive" and the "use of fingers to palpate the skin makes the TSA's pat-down procedure the most intensive search ever conducted." Undeniably, a full-body pat-down intrudes on privacy, but the security threat outweighs that invasion of privacy. And the Administration reduces the invasion of privacy through several measures: the pat-down is not a primary screening method; a member of the same sex ordinarily conducts it; a passenger may opt to have a witness present during the search if he desires to have the security officer conduct the pat-down in private; and the procedure requires a security officer to use the back of his hand while searching sensitive areas of the body.

21

The Fourth Amendment does not compel the Administration to employ the least invasive procedure or one fancied by Corbett. Airport screening is a permissible administrative search; security officers search all passengers, abuse is unlikely because of its public nature, and passengers elect to travel by air knowing that they must undergo a search. *Hartwell*, 436 F.3d at 180. The "jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane" outweighs the slight intrusion of a generic body scan or, as a secondary measure, a pat-down. *United States v. Edwards*, 498 F.2d 496, 500 (2d Cir. 1974) (quoting *United States v. Bell*, 464 F.2d 667, 675 (2d Cir. 1972) (Friendly, C.J., concurring)).

As a final note, our dissenting colleague argues that a determination on the merits is unnecessary because we hold that Corbett's petition was untimely. (Dissent Op. at 27.) But our dissenting colleague relies on opinions stating that constitutional rulings should be avoided where other outcomes could be reached on the merits. *See, e.g., United States v. Charles*, 722 F.3d 1319, 1332–35 (11th Cir. 2013) (Marcus, J., specially concurring) (concluding that it was unnecessary to answer a constitutional question where it was not required for the holding that there was no plain error); *Shaw v. Martin*, 733 F.2d 304, 314 (4th Cir. 1984) (declining to rule on a constitutional question where the evidence would not support the claim even if the constitutional question were decided in petitioner's

favor). These decisions do not stand for the proposition that a merits issue should not be *reached* if it involves a constitutional question. And here, there is no way to resolve the merits without ruling on the constitutional question, so the canon of constitutional avoidance is inapposite.

We make our ruling on the merits because, as our dissenting colleague recognizes, the procedural question of timeliness is debatable, and it is not jurisdictional. Further, the parties have briefed and argued the merits, and we have a complete record. The answer on the merits is clear, as each circuit court to examine it has ruled. And the issue will almost certainly recur, perhaps even with the same petitioner. Our dissenting colleague's contention that we should not address the merits is odd because she suggests that Corbett *did* establish reasonable grounds for the untimeliness of his petition. (Dissent Op. at 28.) If so, then we would be obliged to address the merits of his petition. But our dissenting colleague fails to explain how the merits of this controversy should be resolved.

### C. We Grant the Motion to Seal by the Administration and Deny the Motion to Unseal by Corbett.

Before oral argument, we carried with the case three issues raised by the motion to seal filed by the Administration: (1) whether the copyrighted materials should remain under seal; (2) whether Petitioner should have access to the sensitive security information; and (3) whether Respondent should be required to

file a redacted version of the classified documents or an index with summaries of those documents. We now grant that motion to seal.

As to the copyrighted materials, Eleventh Circuit Rule 25-5 contemplates that parties may file under seal "proprietary or trade secret information." 11th Cir. R. 25-5. And every court of appeals in which the Administration has submitted proprietary information about the scanner technology has ordered it sealed. *See* Order, *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, No. 10-1157 (D.C. Cir. Feb. 22, 2011); Order, *Redfern v. Napolitano*, No. 11-1805 (1st Cir. Aug. 14, 2012). The Administration filed under seal the proprietary information—an operations manual for an advanced imaging technology scanner—because the owner of the information marked the manual with the warning that customers "shall not disclose or transfer any of these materials or information to any third party" and that "[n]o part of this book may be reproduced in any form without written permission" from the company.

We also grant the motion to seal the sensitive security information because Corbett has no statutory or regulatory right to access it. Sensitive security information is "information obtained or developed in the conduct of security activities[,] . . . the disclosure of which TSA has determined would . . . [b]e detrimental to the security of transportation." 49 C.F.R. § 1520.5(a)(3). The Administration may share Sensitive Security Information only with "[c]overed

24

persons" who have a "need to know" the information "to carry out transportation security activities." *Id.* §§ 1520.7(j), 1520.11(a)(1). Congress has permitted the disclosure of sensitive security information during discovery to civil litigants in a *district* court who demonstrate a substantial need for it, Department of Homeland Security Appropriations Act, 2007, Pub. L. No. 109-295, § 525(d), 120 Stat. 1355, 1382 (Oct. 4, 2006), but Corbett is not a litigant in a district court. We reject his suggestion that Congress surely intended to allow litigants in the courts of appeals access to sensitive security information because the plain text of the Act suggests otherwise. We need not address whether Corbett has established a "substantial need" to the information.

Finally, we grant the motion to seal the classified information and do not require the Administration to file a redacted version or index. The Classified Information Procedures Act "allows the district court to permit the government either to redact the classified information or to substitute a summary or a statement of factual admissions in place of the classified documents." *United States v. Campa*, 529 F.3d 980, 995 (11th Cir. 2008) (describing 18 U.S.C. app. 3 § 4). Corbett fails to identify a corresponding statute for civil litigants. And, as a practical matter, Corbett did not need the classified information to argue his case.

We earlier entered a temporary order denying Corbett's motion to release him from his nondisclosure agreement, and we now deny that motion permanently

25

for two reasons. First, the Clerk of this Court caused the mishap that allowed the third party source to obtain the For Official Use Only information, and we do not prejudice the Administration for an error it did not commit. Second, Corbett likely breached his nondisclosure agreement by posting this privileged information on his blog and by sharing that information in an interview.

### III. CONCLUSION

We **DISMISS** Corbett's petition for review as untimely. In the alternative, we **DENY** Corbett's petition because the challenged screening procedure does not violate the Fourth Amendment. We also **GRANT** the motion to seal by the Administration and **DENY** the motion to unseal by Corbett.

MARTIN, Circuit Judge, dissenting:

The majority does what the Supreme Court, our Court, and many other courts have cautioned not to do, and therefore I respectfully dissent.

The opinion finds that Mr. Corbett's petition is untimely, and he failed to establish a reasonable ground for his delay in filing it.  If that is true, the case is over.  Instead the opinion continues on with an unnecessary holding "in the alternative," Panel Op. at 2, which reaches the merits of Mr. Corbett's petition, and finds no violation of the Fourth Amendment.

Long ago, the Supreme Court explained that courts should not "decide questions of a constitutional nature unless absolutely necessary to a decision of the case."  Burton v. United States, 196 U.S. 283, 295, 25 S. Ct. 243, 245 (1905); see also Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105, 65 S. Ct. 152, 154 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.").  Other courts adhere to this maxim.  See, e.g., Shaw v. Martin, 733 F.2d 304, 314 (4th Cir. 1984) ("[W]e should not decide a constitutional question when a factual ground exists for our decision.").  And until now, our Court has generally followed this precept as well.  See, e.g., United States v. Charles, 722 F.3d 1319, 1334 (11th Cir. 2013) (Marcus, J., specially concurring) ("Declining to address an unnecessary

27

constitutional question preserves the unique place and character, in our scheme, of judicial review of governmental action for constitutionality, and pays heed to considerations of timeliness and maturity, of concreteness, definiteness, certainty, and of adversity of interests affected." (quotation marks omitted)).  I do not understand why we ignore this established principle here.[1]

I am also concerned by the majority's conclusion that Mr. Corbett did not establish a reasonable ground for the timing of his filing.  The opinion states: "We have recommended that petitioners file concurrent petitions in multiple courts where jurisdiction is not clear."  Panel Op. at 14.  For support, it cites only one case, Greater Orlando Aviation Authority v. Federal Aviation Administration, 939 F.2d 954 (11th Cir. 1991).  And in citing that case, the majority says that I "fail[] to acknowledge" that in Greater Orlando, this Court "advised" the petitioner to file two appeals concurrently.  But I do fully acknowledge that in Greater Orlando, this Court observed that the Greater Orlando Aviation Authority could have at the same time pursued (1) a state court appeal of a zoning board decision; and (2) an appeal in the 11th Circuit of a Federal Aviation Administration decision that ultimately

---

[1] The majority claims that the opinions cited here "stat[e]" that courts should only avoid ruling on constitutional grounds "where other outcomes could be reached on the merits."  Panel Op. at 22.  None of the opinions make that statement.  Nor do others.  See, e.g., Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347, 56 S. Ct. 466, 483 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. . . . Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.").

related to the location of a new airport in Orlando.  What I absolutely do fail to acknowledge, however, is that this Court's observation in the Greater Orlando decision somehow stands for the proposition that here, Mr. Corbett should have known to file identical briefs, asserting identical claims in both the District Court and this Court at the same time.  Greater Orlando simply does not sanction this practice and neither does this Court's jurisprudence as a whole.

To the contrary, we have cautioned against the possibility of "resources wasted when two courts unnecessarily proceed along the same track and at the same time."  Maharaj v. Sec. for Dep't of Corr., 432 F.3d 1292, 1307 (11th Cir. 2005); see also Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58, 103 S. Ct. 400, 402 (1982) ("[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously.").

Given Mr. Corbett's pro se status, his active pursuit of this challenge was anything but "quixotic," as the majority characterizes it at one point.  Panel Op. at 15 (quotation marks omitted).  Cf. Sierra Club v. Skinner, 885 F.2d 591, 594 (9th Cir. 1989) ("We find it difficult to believe that someone among Sierra Club's legal advisers did not sound a note of caution as to jurisdiction.").  Mr. Corbett's pursuit appears to me to have been methodical and diligent.  Shortly after the Supreme Court confirmed he chose the wrong forum, he immediately filed here.  I do not believe he should be penalized for doing so.  This is especially true where there is

29

no allegation of bad faith, the filing deadline is not jurisdictional, and there is no

prejudice to the government.