[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-15717
Non-Argument Calendar
_____

Agency No. 49 U.S.C. section 46110

JONATHAN CORBETT,

                                                        Petitioner,

versus

TRANSPORTATION SECURITY ADMINISTRATION,

                                                        Respondent.

_____

Petition for Review of a Decision of the
Transportation Security Administration
_____

(July 19, 2019)

Before TJOFLAT, MARCUS and ROSENBAUM, Circuit Judges.

MARCUS, Circuit Judge:

This is Jonathan Corbett's third pro se challenge to some aspect of the Transportation Security Administration's ("TSA") airport scanner equipment using advanced imaging technology ("AIT"). On each occasion, he has claimed that TSA's airport screening procedures violated his right to be free from unreasonable searches and seizures, citing to the Fourth Amendment of the United States Constitution. In an earlier lawsuit that wound up before this Court, Corbett sought to reverse a decision of TSA, challenging the Administration's previous policy that gave passengers at airport security checkpoints the option of obtaining security clearances through either advanced imaging technology (AIT) body screeners or alternative screening procedures, like a physical pat down. A panel of this Court dismissed Corbett's petition as being untimely, and, alternatively, held that TSA's use of body scanners and pat-down procedures did not violate the Fourth Amendment. Corbett v. TSA, 767 F.3d 1171, 1182 (11th Cir. 2014) ("Corbett I"). We had little trouble concluding that the substantial danger to life and property that could result from airplane terrorism outweighed the possible intrusion of TSA's AIT and pat-down screening procedures on airline passengers. Id.

This time Corbett challenges TSA's latest policies and orders that require certain airline passengers to pass through AIT screeners, eliminating for them the option of being screened by a physical pat-down. After careful review, however, we conclude that this Court is without jurisdiction to entertain Corbett's claims. As

2

pled, Corbett lacks the necessary standing to bring this petition, and, accordingly, we are required to dismiss it.

In the absence of standing, the federal courts do not have the power to opine in an advisory capacity about the merits of these claims. We have repeatedly held that "[s]tanding is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." Bochese v. Town of Ponce Inlet, 405 F.3d 964, 974 (11th Cir. 2005) (quotations omitted; citing, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998)). The essential problem here is that Corbett has failed to establish that he suffered an injury in fact, that is, the invasion of a judicially cognizable interest that is concrete and particularized and actual and imminent.

## I.

### A.

We review de novo questions concerning subject-matter jurisdiction, including standing. Elend v. Basham, 471 F.3d 1199, 1204 (11th Cir. 2006). When ruling on standing at the pleading stage, we "must accept as true all material allegations of the [pleading], and must construe [it] in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501 (1975). Moreover, if we have been presented with "facts beyond the four corners" of the pleading that are relevant to the question of standing, we may consider them. Cone Corp. v. Fla. Dep't of

3

Transp., 921 F.2d 1190, 1206 n.50 (11th Cir. 1991). The party invoking federal jurisdiction bears the burden of establishing standing. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

B.

We begin with the relevant background and procedural history surrounding Corbett's petition. Congress vests responsibility for civil aviation security in the TSA Administrator. 49 U.S.C. § 114(d). The Administrator is required to "assess current and potential threats to the domestic air transportation system," take all necessary steps to protect the Nation from those threats, and improve transportation security in general. Id. §§ 44903(b), 44904(a), (e). Among other things, the Administrator must ensure that "all passengers and property" are screened before boarding, to prevent passengers from "carrying unlawfully a dangerous weapon, explosive, or other destructive substance." Id. §§ 44901(a), 44902(a).

Nonmetallic explosives and other nonmetallic threats pose a significant danger to aviation security. See Passenger Screening Using Advanced Imaging Technology, 81 Fed. Reg. 11,364, 11,365 (Mar. 3, 2016) (final rule); see also 49 U.S.C. § 44925(a) (directing TSA to "give a high priority" to the development of new technologies to detect such threats). The danger caught this nation's attention when, on Christmas Day, 2009, a terrorist affiliated with Al Qaeda in the Arabian Peninsula attempted to destroy a plane using a nonmetallic explosive device hidden

4

in his underwear.  Passenger Screening Using Advanced Imaging Technology, 78 Fed. Reg. 18,287, 18,299 (Mar. 26, 2013) (notice of proposed rulemaking); see also id. (describing similar attempts).  The screening procedures then in effect, which included the use of metal detectors and pat-downs, could not detect the Christmas Day bomber's device.  Id.

In October 2010, TSA began using AIT scanners as a primary screening method at airport security checkpoints.  Corbett I, 767 F.3d at 1174–75.  Unlike conventional metal detectors, AIT scanners can detect both metallic and nonmetallic objects concealed on a passenger's body or in a passenger's clothing.  Id.; see 78 Fed. Reg. at 18,297 (listing examples of potentially dangerous items, including nonmetallic threat items, that TSA has discovered using advanced imaging technology).  Indeed, TSA has determined that AIT scanners are the "most effective technology currently available" to repair this "critical weakness" in the Nation's security infrastructure.  81 Fed. Reg. at 11,365.

When AIT scanners were first used, they displayed the actual contours of the scanned passengers' bodies.  They no longer do so -- each scanner instead now notifies TSA agents about potential concealed threats by highlighting those areas on a generic outline of a person, and that generic or stylized image is temporarily shown on a monitor.  See Corbett I, 767 F.3d at 1175.  The image of a screened individual is the same as the images provided for all other screened individuals.  49 U.S.C. §

44901(*l*). Moreover, the AIT scanners in use at American airports do not collect any personally identifiable information, they do not display an individualized image every time a passenger passes through them, and they are not configured to store or to transmit any passenger-specific images. See 81 Fed. Reg. 11,373–82; Privacy Impact Assessment Update for TSA Advanced Imaging Technology, DHS/TSA/PIA-032(d), at 4 (Dec. 18, 2015).

Since TSA began using AIT technology, Corbett has brought at least five suits challenging the Administration's screening policies; two of them did not involve the AIT body scanners. In 2010, Corbett sued TSA in federal district court in Miami challenging the use of AIT scanners as a primary screening method at airport security checkpoints, and moved for a nationwide injunction barring TSA from implementing that or any AIT screening. See Order Granting Mot. to Dismiss, Corbett v. United States, No. 10-cv-24106, 2011 WL 2003529 (S.D. Fla. Apr. 29, 2011). The district court denied the motion and dismissed the action for want of jurisdiction because the procedures he sought to challenge constituted a TSA "order" pursuant to 49 U.S.C. § 46110. Petitioner appealed and moved for interim injunctive relief. A panel of this Court denied that motion, see Order, Corbett v. United States, No. 11-12426 (11th Cir. July 27, 2011), and affirmed the district court's judgment, see Corbett v. United States, 458 F. App'x 866, 871 (11th Cir. 2012), cert. denied, 133 S. Ct. 161 (2012).

6

Corbett later petitioned this Court to review TSA's use of AIT scanners as a primary screening method at airport security checkpoints, and again sought injunctive relief.  A panel of this Court denied the application because it "fail[ed] to meet the applicable standard for granting injunctive relief."  Order, Corbett v. TSA, No. 12-15893 (11th Cir. Apr. 4, 2013).  Thereafter, we dismissed the petition as untimely, and, in the alternative, denied the petition because the challenged screening methodology did not violate the Fourth Amendment. Corbett I, 767 F.3d at 1184.  Petitioner unsuccessfully sought certiorari review.  Corbett v. TSA, 135 S. Ct. 2867 (2015).

Meanwhile, in March 2012, Corbett filed another complaint in the United States District Court for the Southern District of Florida, this time arising out of a TSA screening experience he had at the Fort-Lauderdale-Hollywood International Airport, when he consented to a pat-down after refusing to go through a full-body scanner.  Corbett v. TSA, 568 F. App'x 690, 692 (11th Cir. 2014), cert. denied, 135 S. Ct. 1559 (2015).  He lodged twenty-one claims against TSA, a TSA official, Broward County and the Broward County Sheriff's Office, including Fourth Amendment claims against the TSA official at the airport, Federal Tort Claims Act ("FTCA") claims against the United States, Privacy Act claims against TSA, and a claim against TSA for unredacted records under the Freedom of Information Act ("FOIA").  Id. at 695.  After the district court dismissed the majority of Corbett's

7

claims for failure to state a claim and granted summary judgment on the remaining FOIA claims, a panel of this Court affirmed. Id. at 692. We held that the district court had not erred because, among other things, the search of Corbett's bags by the TSA official and TSA's detention of Corbett were reasonable under the Fourth Amendment, the FTCA claims were barred by sovereign immunity, Corbett had failed to allege that he suffered any damages as required for his Privacy Act claims, and FOIA allowed for the redactions that had been made to documents TSA had provided to Corbett. Id. at 696–705.

Again, in 2015, Corbett filed another petition for review in this Court, this time challenging a TSA program that requires airline employees to ask certain passengers some questions before allowing them to board international flights bound for the United States. Order, Corbett v. TSA, No. 15-10757 (11th Cir. July 21, 2016). There, a panel of this Court concluded that the claim was not justiciable, reasoning that even if Corbett bought a ticket for an international flight, there was no assurance that he would actually be questioned. Id. at 4. The long and short of it was that his claim was speculative and speculative claims could not support constitutional standing. Id.

## C.

Coming then to Corbett's instant petition, TSA issued a notice of proposed rulemaking on March 26, 2013. See 78 Fed. Reg. 18,287. The proposal was

designed to "codif[y] the use of AIT to screen individuals at aviation security screening checkpoints." Id. at 18,289.  The final rule regarding AIT screening was promulgated in March 2016.  See 81 Fed. Reg. 11,364.  The final rule provides that airport security checkpoints "may include the use of [AIT]." Id. at 11,405.  The preamble to the final rule for the first time codified that AIT screening will be mandatory for some passengers as warranted by security considerations.  This rule reflected "current DHS policy." Id. at 11,366.  TSA declined to include a passenger's right to opt-out of AIT screening, writing that the agency "may require AIT use, without the opt-out alternative, as warranted by security considerations in order to safeguard transportation security." Id. at 11,388–89.  TSA explained publicly in a Private Impact Assessment Update that TSA had changed its "operating protocol regarding the ability of individuals to . . . opt-out of AIT screening in favor of physical screening."  Privacy Impact Assessment Update for TSA Advanced Imaging Technology, DHS/TSA/PIA-032(d), at 1 (Dec. 18, 2015). "While passengers may generally decline AIT screening in favor of physical screening, TSA may direct mandatory AIT screening for some passengers as warranted by security considerations in order to safeguard transportation security." Id. at 3.

TSA has explained that the "enhanced screening" procedures -- which require the use of AIT machinery without an opt-out alternative -- apply to individuals

designated as "selectees."  Supp. App'x 90;[1] see also TSA, Frequently Asked

Questions, https://www.tsa.gov/travel/frequently-asked-questions (search "decline

AIT screening") (last visited June 27, 2019) (explaining that "some passengers will

be required to undergo AIT screening if their boarding pass indicates that they have

been selected for enhanced screening").  There are several "[s]electee categories,

which differ based on the individual's [] known [] derogatory and risk information."

Supp. App'x 90.  One of these categories covers "[k]nown or suspected [t]errorists,"

and includes individuals listed in a "Terrorist Screening Database."  Id.  The other

categories have been redacted from the public version of this document.  Id.  In

addition to the categories of selectees created based on risk information, TSA has

created an additional category of selectees, as of July 2016, which is comprised of

---

[1] Congress has directed TSA to "prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security . . . if [TSA] decides that disclosing the information would . . . be detrimental to the security of transportation."  49 U.S.C. § 114(r)(1)(C).  In response to that directive, TSA has defined a body of information as Sensitive Security Information ("SSI") that may not be disclosed except in certain limited circumstances. 49 C.F.R. § 1520.5 (describing information that constitutes SSI); id. § 1520.9(a)(2) explaining that SSI may generally be disclosed only to "covered persons who have a need to know"); id. § 1520.7 (defining "[c]overed persons"); id. § 1520.11 (defining "need to know").  In this case, TSA has filed a Supplemental Appendix containing SSI materials, and has filed a redacted version available for Corbett to review.

Since the filing of Corbett's petition, TSA moved this Court to supplement the record with additional SSI materials, also reproduced in TSA's Supplemental Appendix.  Because the materials contained therein are relevant to the questions before us and will allow us to make a more informed decision as to standing, we GRANT TSA's motion to supplement.  See Schwarz v. Millon Air, Inc., 341 F.3d 1220, 1225 n.4 (11th Cir. 2003); see also Corbett I, 767 F.3d at 1183 (granting TSA's motion to seal SSI materials information because "Corbett has no statutory or regulatory right to access it").

airline passengers <u>randomly</u> chosen as selectees for a particular trip. <u>Id.</u> at 105–06. TSA explained that this policy was designed to inform the general public that "enhanced screening is conducted on a random basis," thereby deterring "[u]nknown terrorists" without significantly impeding checkpoint operations. <u>Id.</u> at 105. When passengers are designated as selectees subject to enhanced screening -- whether they were selected randomly or for risk-based reasons -- their boarding passes always display an "SSSS" notation. <u>See</u> <u>id.</u> at 90. TSA has explained, however, that mandatory AIT screening will be required "in a very limited number of circumstances," so it will not affect the "vast majority of passengers." <u>See</u> TSA, Frequently Asked Questions, https://www.tsa.gov/travel/frequently-asked-questions (search "decline AIT screening") (last visited June 14, 2019).

This policy -- which denies certain passengers the right to opt-out -- is at the heart of Corbett's challenge. He claims that a screening policy banning any opportunity to opt-out of AIT screening violates the Fourth Amendment and the Administrative Procedure Act. Corbett says that the newly minted mandatory policy violates the Fourth Amendment because a physical pat-down would be equally effective. TSA, in turn, argues that mandatory AIT screening procedures for certain passengers is in fact far more effective at detecting threats than the opt-out policy that it replaced. Finally, and, for our purposes, most importantly, TSA urges that

11

Corbett lacks standing to challenge the mandatory screening procedures and, therefore, that this Court is without power to entertain Corbett's claims.

## II.

"It by now axiomatic that the inferior federal courts are courts of limited jurisdiction. They are empowered to hear only those cases falling within the judicial power of the United States as defined by Article III of the Constitution." Univ. of S. Alabama v. Am. Tobacco Co., 168 F.3d 405, 409 (11th Cir. 1999). Article III, then, limits our power only to "cases or controversies." Bowen v. First Family Fin. Servs., Inc., 233 F.3d 1331, 1339 (11th Cir. 2000). One essential component of the "case or controversy" requirement is that the plaintiff must have standing to pursue his claim in a federal court. Id. Indeed, standing is a threshold question that must be explored at the outset of any case. Bochese, 405 F.3d at 974. In its absence, "a court is not free to opine in an advisory capacity about the merits of a plaintiff's claim." Id. In fact, standing is "perhaps the most important jurisdictional" requirement, and without it, we have no power to judge the merits. Id. (quotations omitted).[2]

---

[2] It may be that there are also problems of ripeness and finality lurking in Corbett's petition for review. The ripeness doctrine examines "whether there is sufficient injury to meet Article III's requirement of a case or controversy and, if so, whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decision-making by the court." Elend v. Basham, 471 F.3d 1999, 1210–11 (11th Cir. 2006). Whether an agency action is "final" depends on if the agency's action has been "consummated," as opposed to being "tentative and interlocutory," and if the action is one by which "rights and obligations have been determined" or from which "legal consequences will flow." Nat'l Parks Conservation Ass'n v.

12

The three prerequisites for standing are that: (1) the plaintiff has suffered an "injury in fact" -- an invasion of a judicially cognizable interest, which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there be a causal connection between that injury and the conduct complained of -- the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it be likely, not merely speculative, that the injury will be redressed by a favorable decision.  Lujan, 504 U.S. at 560–61; see also 31 Foster Children v. Bush, 329 F.3d 1255, 1263 (11th Cir. 2003).  "By insisting that a plaintiff show a substantial likelihood of future injury, in the absence of declaratory or injunctive relief, courts further one of the purposes of the constitutional standing requirement -- reserving limited judicial resources for individuals who face immediate, tangible harm absent the grant of declaratory or injunctive relief."  Bowen, 233 F.3d at 1340 (citing 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 3532.1, at 114 (2d ed. 1984)).

---

Norton, 324 F.3d 1229, 1236 (11th Cir. 2003) (quotations omitted).  But because the standing issue before us is straightforward, because standing is paramount among our jurisdictional inquiries, and because the parties have not argued ripeness or finality, we dismiss Corbett's petition on standing grounds alone.  As the Supreme Court has explained, "a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits."  Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431 (2007) (citations and quotations omitted).  Indeed, "[t]here is no mandatory sequencing of jurisdictional issues." Id. (citation and quotations omitted).

13

In order to satisfy the injury-in-fact requirement of standing, a plaintiff may show that he "has sustained or is immediately in danger of sustaining some direct injury." Lynch v. Baxley, 744 F.2d 1452, 1456 (11th Cir. 1984) (quoting O'Shea v. Littleton, 414 U.S. 488, 494 (1974)). "Plaintiffs must demonstrate a personal stake in the outcome in order to assure that concrete adverseness which sharpens the presentation of issues necessary for the proper resolution of constitutional questions." City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983) (quotations omitted). "Abstract injury is not enough." Id. A plaintiff need not wait for an injury to occur, so long as he "is immediately in danger of sustaining some direct injury" as a result of the challenged official conduct and the injury or threat of injury is both "real and immediate," not "conjectural" or "hypothetical." Id. at 101–02 (quotations omitted); see also Whitmore v. Arkansas, 495 U.S. 149, 158 (1990) ("A threatened injury must be certainly impending to constitute injury in fact.") (quotations omitted); 31 Foster Children, 329 F.3d at 1266–67 (noting that standing for declaratory or injunctive relief requires that future injury "proceed with a high degree of immediacy"). Immediacy requires that the anticipated injury occur within some fixed period of time in the future. Fla. State Conference of N.A.A.C.P. v. Browning, 522 F.3d 1153, 1161 (11th Cir. 2008). "When a plaintiff cannot show that an injury is likely to occur immediately, the plaintiff does not have standing to seek prospective relief even if he has suffered a past injury." 31 Foster Children,

329 F.3d at 1265.  And even if the plaintiff shows immediacy, the injury must still be substantially likely to actually occur, meaning that the threatened future injury must pose a realistic danger and cannot be merely hypothetical or conjectural.  Fla. State Conference of N.A.A.C.P., 522 F.3d at 1161; see also Bowen, 233 F.3d at 1340 (observing that a "perhaps or maybe chance" of an injury occurring is not enough for standing).

The Supreme Court extensively explored the idea of future injury in City of Los Angeles v. Lyons.  There, the plaintiff, Adolph Lyons, sought to enjoin Los Angeles police officers from using a certain chokehold technique in order to render arrestees unconscious.  461 U.S. at 97–98.  Lyons claimed that he had been personally subjected to the challenged technique in the past, and that Los Angeles police officers "routinely appl[ied] chokeholds in situations where they are not threatened by the use of deadly force."  Id. at 105.  In holding that Lyons lacked standing to sue, the Supreme Court explained that while Lyons "may have been illegally choked by the police" in the past, this "does nothing to establish a real and immediate threat that he would again be . . . illegally choke[d]" in the future.  Id. The Supreme Court recognized that, "among the countless encounters between the police and the citizens of . . . Los Angeles, there will be certain instances in which strangleholds will be illegally applied."  Id. at 108.  Nevertheless, "it is . . . no more than speculation to assert either that Lyons himself will again be involved in one of

those unfortunate instances, or that he will be arrested in the future and provoke the use of [the] chokehold" technique that Lyons challenged.  Id.  In other words, "even assuming that Lyons would again be stopped for a traffic or other violation in the reasonably near future, it is untenable to assert, and the complaint made no such allegation, that strangleholds are applied by the Los Angeles police to every citizen who is stopped or arrested regardless of the conduct of the person stopped."  Id.

Applying Lyons, we've held many times that a plaintiff failed to establish an injury in fact when the likelihood of future constitutional injury was too speculative. Thus, for example, in J W ex rel. Williams v. Birmingham Bd. of Educ., 904 F.3d 1248 (11th Cir. 2018), some Birmingham high school students sued the Birmingham school board and the City's police department, alleging that the defendants used excessive force in violation of the Fourth Amendment by spraying Freeze +P -- an incapacitating chemical spray -- on students and by failing to adequately decontaminate them.  A panel of this Court held that the student class representative lacked standing to seek declaratory and injunctive relief barring the use-of-spray claims because there was no "real and immediate threat that she would be subjected to excessive force" by the use-of-spray policy.  Id. at 1265.  Again, the "likelihood of future constitutional injury [was] too speculative" because the intentional "use of chemical spray in Birmingham high schools had been infrequent," with an estimated 0.4% chance per student, and "[a]llegations of intentional chemical spraying that

16

also constitutes excessive force were <u>even more rare</u>," with an estimated 0.003% chance per student. <u>Id</u>. at 1268 (emphases added). We did not suggest that Freeze +P would never be used against a student in an unconstitutional way by a police officer, but we concluded nevertheless that "the probability of future instances of unconstitutional spraying is [in]sufficient to provide standing to obtain declaratory and injunctive relief." <u>Id</u>. For the same reasons, we extended the holding to bar the decontamination claims, where there was only an estimated 1.77% chance of a student being intentionally or unintentionally sprayed and improperly decontaminated. <u>Id</u>. at 1273.

We faced the same problem in <u>Bowen v. First Family Financial Services</u>, where the plaintiffs challenged a lender's practice of requiring customers to sign arbitration agreements. 233 F.3d at 1333. We did not address the merits of the plaintiffs' claims that the practice violated the Truth in Lending Act ("TILA") because we concluded that the plaintiffs lacked standing to pursue their TILA claims. <u>Id</u>. at 1341. The plaintiffs had not shown a "substantial likelihood that [the defendant] will take some action that at least arguably violates the TILA or some related law." <u>Id</u>. at 1340. We went on to say that if the defendant were to violate TILA, "we would also have to find there was a substantial likelihood that the plaintiffs and [the defendant] would be unable to resolve any resulting dispute without litigation," and "[t]he undeniable fact is that the <u>vast majority</u> of credit

17

transactions such as the ones in this case do not result in litigation." Id. (emphasis added). Without more, "enforcement of the arbitration agreement against these plaintiffs" was not "certainly impending," for purposes of the standing inquiry. Id.

Still again, a panel of this Court addressed the requirements of standing in Elend v. Basham, 471 F.3d 1199 (11th Cir. 2006). There, the plaintiffs had been protesting outside of the Sun Dome in Tampa, Florida during a political rally attended by President George W. Bush in 2002. Id. at 1202–03. The Secret Service ordered them to move to an authorized "protest zone," which was further away. Id. The plaintiffs sought to enjoin the Secret Service from taking similar action in the future that they said would violate their First Amendment rights, and they claimed to have standing because they "fully intend[ed] to peacefully express their viewpoints in the future in a manner similar to their activities on November 2, 2002 in concert with presidential appearances at the . . . Sun Dome and at other locations around the country." Id. at 1204. We affirmed the district court's dismissal of the claims because the plaintiffs' intention to protest in a similar manner in the future was too speculative. "Other than the one instance in November 2002, we [we]re not even given a description of Plaintiffs' past conduct from which to infer that they might act in a similar manner in the future," and thus it was "entirely conjectural that President Bush would return to speak at a political rally at the Sun Dome." Id. at 1209.

On the record presented to this Court, Corbett's theory of standing is just as conjectural and speculative as the claims made by the plaintiffs in Lyons, in J W, in Bowen, and in Elend, if not more so. For starters, Corbett has not claimed that he has ever been subjected to mandatory AIT screening under the current TSA policy that he is challenging, nor that he represents a heightened security risk that would trigger mandatory screening under the policy. Nor, finally, has he claimed that his boarding pass has ever had an "SSSS" notation on it. We recognize that the mandatory AIT screening policy on review was not fully in place until July 2016, after Corbett filed his petition with us in December of 2015, which means that Corbett may not have yet had a chance to make these claims in his petition. Significantly, however, since he filed his petition, Corbett has never said that he has been selected for mandatory screening or that he represents a heightened security risk.

While we typically confine our standing analysis to the four corners of the complaint, we may look beyond it when we have before us facts in the record. Cone Corp., 921 F.2d at 1206 n.50; see also Elend, 471 F.3d at 1208 ("[I]n the context of a Rule 12(b)(1) challenge to standing, we are obliged to consider not only the pleadings, but to examine the record as a whole to determine whether we are empowered to adjudicate the matter at hand." (quotations omitted)). So, in Elend, we found the plaintiffs' future intentions insufficiently clear to establish standing

19

where the original allegedly unconstitutional incident had occurred many years before our decision without any suggestion that it had occurred again. 471 F.3d at 1209. We observed that "the injury alleged . . . remains wholly inchoate" where "[p]laintiffs' intention . . . to protest 'in concert with presidential appearances at the USF Sun Dome and at other locations around the country' fail[ed] to provide any limitation on the universe of possibilities of when or where or how such a protest might occur." Id. It was "entirely conjectural that President Bush would return to speak at a political rally at the Sun Dome," and there was "no indication that he ha[d] done so again since November 2002 despite numerous presidential visits to Florida." Id.

Here, both parties have submitted extensive materials since the filing of Corbett's petition, including the Petitioner's declarations about his travel experiences and plans and materials submitted by TSA. In light of these subsequent filings, it's telling that Corbett has never said, in his declarations or otherwise, that he has been subjected to the policy. Indeed, Corbett has told us that he flew no less than 150,000 miles on over 100 domestic flights from 2013 to 2015, and that because he "fl[ies] at least 50 times a year for both business and personal reasons, [he] will have at least 50 more opportunities to be randomly selected in 2016." See Decl. of Jonathan Corbett at 1 (Dec. 24, 2015); Decl. of Jonathan Corbett at 3 (Sep. 19, 2016). But despite his declaration that he has flown and will continue to take, as best we

can tell, over 50 flights a year, he's taken approximately 150 flights to date since 2016, without incident. Even in Lyons, J W and Elend, the plaintiffs claimed to have suffered some sort of injury as a result of the challenged policy in the past. See J W, 904 F.3d at 1253, 1264 (recognizing that "[p]ast wrongs serve as evidence of whether there is a real and immediate threat of future injury" and that "[a] number of Birmingham high school students . . . were sprayed with or exposed to Freeze +P in 2009, 2010, and 2011"); see also Lyons, 461 U.S. at 108 ("We note that five months elapsed between October 6, 1976, and the filing of the complaint, yet there was no allegation of further unfortunate encounters between Lyons and the police."); Elend, 471 F.3d at 1209 (describing the plaintiffs' "one instance in November 2002"). Corbett, however, has never said that he was subjected to the mandatory TSA policy, before his petition or since then, even though he has made numerous filings since he lodged his petition for review containing substantial information about his travel patterns and his interactions with TSA.

Thus, Corbett is left to argue only that he might be designated as a selectee under TSA's random selection process. He first says it's likely he will be randomly selected in the future because he "regularly gets the 'full treatment'" from TSA, and under its past procedure, TSA randomly subjected him to "selectee" screening on "at least 3 occasions" and to an unspecified form of "elevated screening" on "several more occasions." Pet. Br. at 2. Importantly, however, Corbett recognizes that TSA's

21

policy has changed, Pet. Br. at 5, which makes his prior screening history irrelevant. Cf. Beta Upsilon Chi Upsilon Chapter at the Univ. of Fla. v. Machen, 586 F.3d 908, 917 (11th Cir. 2009) ("In cases where government policies have been challenged, the Supreme Court has held almost uniformly that voluntary cessation of the challenged behavior moots the claim.").

In the alternative, Corbett hypothesizes that, as a frequent flyer who intends to continue flying frequently, it is likely that he will be randomly chosen to be a selectee passenger in the future. See Pet. Opp. To MTD at 6; see also Decl. of Jonathan Corbett at 3 (Sep. 19, 2016). We recognize there's a chance that he might be selected in the future, based on the random selection process, but that is not enough under our case law to show a substantial likelihood of future injury that is "real and immediate," "actual and imminent," and not "conjectural" or "hypothetical." Lujan, 504 U.S. at 560 (quotations omitted); Lyons, 461 U.S. at 102 (quotations omitted). Notably, as TSA has explained, its AIT screening policy does not affect the "vast majority" of airline passengers. TSA, Frequently Asked Questions, http://www.tsa.gov/travel/frequently-asked-questions (last visited June 27, 2019). We used this exact phrase in Bowen, where we held that the plaintiffs lacked standing to make a TILA claim since the "vast majority of credit transactions" would not involve at least some arguable violation of TILA or a related law. Bowen, 233 F.3d at 1340 (emphasis added). The odds of something not happening the "vast

majority" of times can be compared with the plaintiffs' claims in Mulhall v. UNITE HERE Local 355, 618 F.3d 1279, 1288 (11th Cir. 2010) (holding that a plaintiff's First Amendment rights were "at imminent risk of invasion" because an agreement his employer entered into with a labor union "substantially increase[d] the likelihood" that he would be unionized against his will); Browning, 522 F.3d at 1163–64 (holding in an associational standing case that the 20,000-member organization had standing where it was "highly unlikely" that not a single member of the organization would be injured since "someone is certain to get injured in the end"); and GTE Directories Pub. Corp. v. Trimen Am., Inc., 67 F.3d 1563, 1569 (11th Cir. 1995) (concluding that the "practical likelihood" the contingencies would occur was "very high" and "almost inevitable").

It's also worth noting that we've reviewed the unredacted sensitive security materials provided to the Court by TSA, and, after considering the actual percentage of passengers that TSA expects to randomly select for mandatory AIT screening, we have no doubt that Corbett does not risk a substantial likelihood of future injury. See Supp. App'x 105–06 (explaining that, under the selectee-designation regime currently in effect, no more than [REDACTED MATERIAL] airline passengers are randomly designated as selectees to whom the challenged policy would apply); see also Order, Corbett v. TSA, No. 15-15717 (11th Cir. June 6, 2016) (granting TSA's request to file portions of the administrative record ex parte and under seal); Order,

23

Corbett v. TSA, No. 15-15717 (11th Cir. Nov. 30, 2016) (granting TSA's request to file a supplemental appendix ex parte and under seal); Order, Corbett v. TSA, No. 15-15717 (11th Cir. May 1, 2017) (denying Corbett's request for reconsideration); see generally Corbett I, 767 F.3d at 1183 (granting TSA's motion to seal SSI materials).

We do not deny that the "countless encounters between" TSA agents and airline passengers may well give rise to "certain instances in which" the mandatory-AIT-screening policy will be applied to someone. Lyons, 461 U.S. at 108. But, as the Supreme Court said in Lyons, that fact does not make Corbett's claim any less conjectural. See id. (finding no injury-in-fact despite recognizing "certain instances in which strangleholds will be illegally applied and injury and death unconstitutionally inflicted on the victim"). Indeed, even if Corbett sought to represent a class of people, at least one of whom would likely be affected -- and he has not sought class relief in this case -- that would not be enough to make his claim sufficiently likely. See J W, 904 F.3d at 1268, 1272 (finding no injury-in-fact for the class representative despite recognizing that the spray may be used against a student in an unconstitutional way "in the future" because "named plaintiffs who represent a class must allege and show that they personally have been injured") (quotations omitted).

24

Corbett's claim of future injury is weakened still further because, even accepting the small chance that Corbett may be randomly subjected to the new policy at some indeterminate time in the future, there's an even smaller chance that his random selection for participation in the mandatory screening program will result in a constitutional injury.  As we've said, sometimes our standing analysis requires us to take a "peek" at the merits of the underlying constitutional claim.  Club Madonna, Inc. v. City of Miami Beach, 924 F.3d 1370, 1382 (11th Cir. May 24, 2019)).  We explained in Club Madonna that while "standing in no way depends on the merits" of a plaintiff's claim, "it often turns on the nature and source of the claim asserted," and in some circumstances "weakness on the merits" informs the question of Article III standing.  Id. (quotations omitted); id. at 1383 (holding that the Club lacked standing where, among other things, it could not "clear the low bar of demonstrating that the challenged provisions are at least arguably [unconstitutionally] vague as applied to it").  And in Lyons, the Supreme Court relied in part on the recognition that not every "traffic stop, arrest, or other encounter between the police and a citizen" will result in "the police [acting] unconstitutionally and inflict[ing] injury without provocation or legal excuse."  461 U.S. at 108.  Similarly, in J W, we relied in part on the realization that the "chance of being unconstitutionally sprayed" was "miniscule."  904 F.3d at 1268 (emphasis added); see also Kerr v. City of West Palm Beach, 875 F.2d 1546, 1554 (11th Cir. 1989) (concluding that plaintiffs who had

25

been seriously injured when bitten by police dogs in the course of their arrests by West Palm Beach police officers lacked standing where the police policy might "permit unconstitutional seizures in some circumstances," but did "not require its officers to act unconstitutionally").

Here, Corbett has alleged that the TSA policy -- which randomly selects certain passengers to undergo mandatory AIT screening -- violates the Fourth Amendment. Notably, however, a panel of this Court has already held, when Corbett challenged the previous TSA screening regime on Fourth Amendment grounds, that the use of AIT scanners is constitutional. See Corbett I, 767 F.3d at 1174. We explained that "[t]he scanners at airport checkpoints are a reasonable administrative search [under the Fourth Amendment] because the governmental interest in preventing terrorism outweighs the degree of intrusion on Corbett's privacy and the scanners advance that public interest." Id. at 1180; see also id. at 1182 ("The jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane outweighs the slight intrusion of a generic body scan or, as a secondary measure, a pat-down.") (quotations omitted). As we detailed, the AIT scanners, equipped with automated target recognition software "effectively reduce the risk of air terrorism" while "pos[ing] only a slight intrusion on an individual's privacy." Id. at 1181. There, as here, the AIT scanners do not collect any personally identifiable information, nor do they display an

26

individualized image every time a passenger passes through them; rather, the software temporarily overlays the location of potential threats onto a generic and stylized figure. See id. at 1175; see also 81 Fed. Reg. 11,373–82; Privacy Impact Assessment Update for TSA Advanced Imaging Technology, DHS/TSA/PIA-032(d), at 4 (Dec. 18, 2015).

While Corbett I involved TSA's prior system -- which allowed passengers to opt-out of AIT screening and choose a pat-down instead -- the opinion did not turn on the opt-out option. To the contrary, Corbett took issue with alternative pat-down procedures as well. Corbett I, 767 F.3d at 1182. And in any event, we explained that "the United States enjoys flexibility in selecting from among reasonable alternatives for an administrative search." Id. at 1181. "The Fourth Amendment does not compel the Administration to employ the least invasive procedure or one fancied by Corbett." Id. at 1182.

Nor does the strength of his APA claims bolster his standing arguments. Again, without drawing any conclusions, despite Petitioner's suggestion that TSA failed to use the notice-and-comment rulemaking process to implement the challenged screening policy, the policy was promulgated after a notice-and-comment rulemaking process that expressly invited comment on "the ability of passengers to opt-out of AIT screening." 78 Fed. Reg. at 18,294. And as for Corbett's argument that the challenged policy is so devoid of justification that it must

be reversed as arbitrary and capricious, we've already held in one of Corbett's earlier cases that TSA's AIT body scanners are a reasonable administrative search, and that "the United States enjoys flexibility in selecting from among reasonable alternatives for an administrative search." Corbett I, 767 F.3d at 1180–81.

All of this is to say that Corbett has not shown a substantial likelihood of a future injury that is "real and immediate," "actual and imminent," and not "conjectural" or "hypothetical." Lujan, 504 U.S. at 560 (quotations omitted); Lyons, 461 U.S. at 102 (quotations omitted). Just as in Lyons, where the Supreme Court determined that the likelihood of unconstitutional chokeholds was too remote, or as in J W, where this Court found that the likelihood of being unconstitutionally sprayed was too removed, we cannot say that the likelihood of Corbett being unconstitutionally scanned at the airport is substantial enough. To be clear, we cannot and do not hold that the mandatory AIT scanning now used by TSA is constitutional; we can't reach that question without the power to do so. See Bochese, 405 F.3d at 974. Nevertheless, we are able to say that based on our holding in Corbett I that TSA's AIT scanning regime as a general matter was not unconstitutional, and more importantly, based on our reading of this record, it's

entirely too speculative to assume that Corbett would be subjected to TSA's new policy in an unconstitutional manner.[3]

As for Corbett's alternative argument that he has standing based on the "chilling effect" that the policy has on his travel because he faces an administrative fine of up to $11,000 and the loss of his airfare if he refuses to complete screening at a TSA checkpoint, we remain unpersuaded. The Supreme Court has explained that parties "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 416 (2013). Corbett cannot demonstrate that the possible harm of maybe having to undergo mandatory AIT screening at some indeterminate time is impending, and his subjective fear of this harm is not sufficient to create standing. And, in any event, we cannot ignore

---

[3] Corbett also claims that many of the injury-in-fact cases we rely on, like Lyons, are distinguishable, because no chain of attenuated events must occur before Corbett will be randomly subjected to mandatory AIT screening. But that is a distinction without a difference. In either instance, be it through TSA's random selection process or the steps involved in a police interaction that may result in a chokehold, the resulting probability of a future unconstitutional injury is too small to constitute an injury in fact. Moreover, to the extent the courts are more likely to confer standing where the plaintiffs' alleged constitutional injuries are the result of involuntary conduct, see J W, 904 F.3d at 1269 (noting that plaintiffs with standing in other cases "could not avoid exposure to the conduct they challenged because their own behavior or situation, which drove the challenged conduct, was involuntary"), Corbett cannot claim that his conduct is involuntary. As we said in one of Corbett's earlier challenges to TSA's screening process, being an airline traveler is a voluntary pursuit, since "passengers elect to travel by air knowing that they must undergo a search." Corbett I, 767 F.3d at 1182; see also J W, 904 F.3d at 1269 (rejecting the standing argument that students were sprayed simply because of their status as students since "[s]tudents may misbehave or act defiantly from time to time, but they can control their own behavior"). So while we accept that cases like Lyons, J W, Elend and Bowen do not map directly onto this case, they are nevertheless instructive.

29

Corbett's statement in several filings that he "has not and has no intention of changing his travel patterns."  Reply Br. at 2; Pet. Opp. To MTD at 6; Decl. of Jonathan Corbett at 1 (Dec. 24, 2015).  This admission severely undermines the claim that TSA's policy has had a chilling effect on his travel plans.

His remaining arguments fare no better.  He suggests that because he has also brought claims under the Administrative Procedure Act, we should exercise jurisdiction because he has the "substantial interest" required by 49 U.S.C. § 46110(a) -- the statute that provides for judicial review of TSA orders.  But even if Corbett satisfies the statutory requirement that he have a "substantial interest" in the challenged screening policy, he must first establish the type of injury in fact that is a prerequisite to maintaining suit under Article III of the Constitution.  See Illinois Dep't of Transp. v. Hinson, 122 F.3d 370, 371 (7th Cir. 1997) (explaining that 49 U.S.C. § 46110(a)'s requirement that a person have a "substantial interest" means "[a]t a minimum, . . . someone who has the kind of interest that Article III of the Constitution has been interpreted to make prerequisite to maintaining a suit in any Article III court"); see also Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1279 (11th Cir. 2015) (recognizing that a plaintiff seeking to bring suit under a federal statute must show both that he has Article III standing and also that his injury in fact "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.").

30

And to the extent Corbett points to this Court's exercise of jurisdiction in Corbett I, it's also irrelevant because there, he was challenging a different policy that applied to all passengers, see Corbett I, 767 F.3d at 1174 (describing the challenged policy as "standard operating procedures for security screening nationwide"), whereas the policy Corbett now challenges does not affect the "vast majority" of passengers.

Finally, it may be possible for Corbett to bring a Fourth Amendment challenge to TSA's policy in the future -- if, among other things, he is able to establish, based on a new set of facts, that he has a substantial likelihood of injury that is "real and immediate," "actual and imminent," and not "conjectural" or "hypothetical." Lujan, 504 U.S. at 560 (quotations omitted); Lyons, 461 U.S. at 102 (quotations omitted). All we hold today -- indeed all we could hold today -- is that on this record, Corbett has not claimed a sufficient injury in fact. He's not said that he's ever been subjected to the TSA policy, let alone that he suffers a greater likelihood of injury in the future than the likelihood urged by the unsuccessful plaintiffs in Lyons, or in J W, or in Elend -- for purposes of our standing inquiry. We are, therefore, required to dismiss his petition.

**PETITION DISMISSED.**

31